**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| HENRI A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-00461-TWP-TAB |
| | ) | |
| KILOLO KIJAKAZI, Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Henri A.[1] requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "SSA"), denying his application for Disability Insurance Benefits under the Social Security Act.  For the following reasons, the Court **affirms** the decision of the Commissioner.

**I.     PROCEDURAL BACKGROUND**

On April 11, 2019, Henri A. filed an application for Disability Insurance Benefits, alleging a disability onset date of March 28, 2017.  (Filing No. 8-2 at 11.)  His application was initially denied on August 21, 2019, (Filing No. 8-5 at 2), and upon reconsideration on January 30, 2020, (Filing No. 8-5 at 13).  Due to the coronavirus pandemic, Administrative Law Judge Peter J. Baum (the "ALJ") conducted a telephone hearing on November 18, 2020, during which Henri A., represented by counsel, and a vocational expert ("VE") participated and testified.  (Filing No. 8-3 at 7-26.)  The ALJ issued a decision on January 7, 2021, concluding that Henri A. was not entitled

---

[1] To protect the privacy interests of claimants for Social Security benefits, and consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first names and last initials of non-governmental parties in its Social Security judicial review opinions.

to benefits.  (Filing No. 8-2 at 8-37.)  The Appeals Council denied review on January 11, 2022.

(Filing No. 8-2 at 2.)  On March 9, 2022, Henri A. timely filed this civil action, asking the Court

pursuant to 42 U.S.C. § 405(g) to review the final decision of the Commissioner.  (Filing No. 1.)

## II.   <u>STANDARD OF REVIEW</u>

"The Social Security Administration (SSA) provides benefits to individuals who cannot

obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151

(2019).  Disability is defined as the "inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A); *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).  To

be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him

from doing not only his previous work but any other kind of gainful employment which exists in

the national economy, considering his age, education, and work experience.  42 U.S.C. §

423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant

is disabled.  At step one, if the claimant is engaged in substantial gainful activity, he is not disabled

despite his medical condition and other factors.  20 C.F.R. § 404.1520(a)(4)(i).  At step two, if the

claimant does not have a "severe" impairment that also meets the durational requirement, he is not

disabled.  20 C.F.R. § 404.1520(a)(4)(ii).  A severe impairment is one that "significantly limits [a

claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  At

step three, the Commissioner determines whether the claimant's impairment or combination of

impairments meets or medically equals any impairment that appears in the Listing of Impairments,

20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the fourth and fifth steps.  *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v).  Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite [his] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996), 1996 WL 374184).  At step four, if the claimant can perform his past relevant work, he is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work, given his RFC and considering his age, education, and past work experience.  20 C.F.R. § 404.1520(a)(4)(v).  The claimant is not disabled if he can perform any other work in the relevant economy.  *Id*.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision.  *Stephens*, 888 F.3d at 327.  For the purpose of judicial review, "substantial evidence" is such relevant "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'"  *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154).  "Although this Court reviews the record as a whole, it cannot substitute its own judgment

for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327.  Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)).  The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits.  *Stephens*, 888 F.3d at 327.  When an ALJ does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy.  *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021).  Typically, a remand is also appropriate when the decision is not supported by substantial evidence.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

### III.   FACTUAL BACKGROUND

When Henri A. filed his application, he alleged that he could no longer work because of a lumbar disc herniation and annular tear, bilateral foraminal stenosis, cervical spine issues, a shifted coccyx, anxiety, depression, a sleep disorder, and pain.  (Filing No. 8-8 at 32.)  He was 36 years old when his alleged disability began.  (Filing No. 8-7 at 2.)  Henri A. had completed approximately two years of college but did not earn a degree.  (Filing No. 8-3 at 9.)  He is certified as a plumber and had worked in fast food service, as a dishwasher, delivery driver, skilled construction worker, janitor, and laborer.  (Filing No. 8-8 at 33.)  The relevant evidence of record is amply set forth in the parties' briefs, as well as the ALJ's decision and need not be repeated here. Below are the facts relevant to the Court's disposition of this case.

The ALJ followed the five-step sequential evaluation set forth by the SSA in 20 C.F.R. § 404.1520(a)(4) and concluded that Henri A. was not disabled.  (Filing No. 8-2 at 36-37.)  At step one, the ALJ found that Henri A. had not engaged in substantial gainful activity[2] since March 28, 2017, the alleged onset date.  (Filing No. 8-2 at 13.)  At step two, the ALJ found that Henri A. had "the following severe impairments: degenerative disc disease of the cervical and lumbar spine, COPD [chronic obstructive pulmonary disease], emphysema with spontaneous pneumothorax, a personality disorder not otherwise specified, and a status post right wrist fracture."  (Filing No. 8-2 at 14.)  At step three, the ALJ found that he did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  *Id*.  After step three but before step four, the ALJ concluded:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant could occasionally lift/carry up to 10 pounds and less than 10 pounds frequently.  The claimant can stand/walk for 6 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday.  The claimant can push/pull up the weights indicated to lift/carry.  The claimant can occasionally climb ramps and stairs, but he should never climb ladders, ropes or scaffolds.  The claimant can frequently balance and occasionally stoop, kneel, crouch and crawl.  The claimant can frequently perform gross and fine manipulation with his right upper extremity.  The claimant should avoid concentrated exposure to extreme cold, wetness, fumes, dusts, odors, gasses or poor ventilation, and he should avoid even moderate exposure to hazards, such as machinery and unprotected heights.  The claimant can only occasionally interact with the general public or with coworkers or supervisors after a brief training period less than 30 days.

(Filing No. 8-2 at 19-20.)  At step four, the ALJ found, considering the VE's testimony and Henri A.'s RFC, that he could not perform his past relevant work in a composite job as a loader operator and backhoe operator.  (Filing No. 8-2 at 35.)  At step five, the ALJ found, considering the VE's

---

[2] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized).  20 C.F.R. § 404.1572(a).

testimony and Henri A.'s age, education, work experience, and RFC, that he could have performed other work with jobs existing in significant numbers in the national economy in representative occupations like an addressor and document preparer.  (Filing No. 8-2 at 35-36.)

## IV.   DISCUSSION

Henri A. makes three assertions of error that: (1) the ALJ's RFC finding failed to include all of Henri A.'s mental limitations, (Filing No. 13 at 11-14), (2) the ALJ relied on boilerplate language to discredit Henri A.'s statements concerning his subjective symptoms, (Filing No. 13 at 14-17), and (3) the ALJ's step five finding that Henri A. could perform other work existing in significant numbers in the national economy is not supported by substantial evidence, (Filing No. 13 at 17-19).  The Court will address the issues in turn.

### A.   Mental RFC

"As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).  Relevant to Henri A.'s mental impairments, the ALJ found that he could "only occasionally interact with the general public or with coworkers or supervisors after a brief training period less than 30 days." (Filing No. 8-2 at 20.)

The ALJ found the prior administrative medical findings of the state agency reviewing psychological consultants to be persuasive.  (Filing No. 8-2 at 32); *see* 20 C.F.R. § 404.1520c(a); 20 C.F.R. § 404.1513a(a)(1).  Henri A. contends that the ALJ incorporated only one of the limitations that the reviewing consultants assessed.  (Filing No. 13 at 12.)  The consultants provided verbatim descriptions of the RFC limitations that they assessed that Henri A. "should be able to perform simple or detailed work in a low social context." (Filing No. 8-4 at 16; Filing No. 8-4 at 39.)  The ALJ's RFC finding did not limit the complexity of work that Henri A. could perform, but at step

five, the ALJ found that Henri A. could perform unskilled occupations.[3]   (Filing No. 8-2 at 36.)

Henri A. has not made any argument concerning the complexity of the work that the ALJ found

he could perform.   "Perfunctory and undeveloped arguments are waived, as are arguments

unsupported by legal authority." *Krell v. Saul*, 931 F.3d 582, 586 n.1 (7th Cir. 2019) (quoting

*Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016)).   Any

argument concerning the consultants' assessments that Henri A. was limited to simple or detailed

work is waived.   And Henri A. has not argued that the ALJ's RFC finding limiting him to

occasional interaction with the public, coworkers, and supervisors was inadequate to account for

the consultants' assessments that he should be limited to work in a low social context.   Regarding

vocationally relevant terms that could be communicated to the VE, a "low social context" is vague.

The ALJ's translation into more quantifiable terms appears reasonable, and Henri A. has not

challenged that particular aspect of the ALJ's RFC finding.

Henri A. argues that "the limitation that was included in the RFC, a restriction on the

quantity of interactions, does not address the qualitative limitations found by the doctors." (Filing

No. 13 at 12.)  He further argues that "[t]he inability to accept instructions, respond appropriately

to criticism from supervisors, or exhibiting behavioral extremes speak to the quality of an

interaction and cannot be properly mitigated with a quantitative limitation." *Id*.  Henri A. refers

to the reviewing psychological consultants' verbatim checklist assessments of the paragraph B

criteria[4] that he had moderate limitations with his abilities to interact appropriately with the public,

---

[3] The SSA's guidance explains that "[t]he DOT lists a specific vocational preparation (SVP) time for each described occupation.  Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2 . . . ." SSR 00-4P (S.S.A. Dec. 4, 2000), 2000 WL 1898704, at *3.  The regulatory definition of unskilled work is work "which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568.

[4] The limitations identified in the paragraph B criteria are used to rate the severity of mental impairments at steps two and three of the sequential evaluation process. 20 C.F.R. § 404.1520a(d)-(e).  The RFC assessment used at steps four and five requires is a detailed assessment of the various functions used to rate the paragraph B criteria.  SSR 96-8p,

accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Filing No. 8-4 at 15; Filing No. 8-4 at 39.)  But in *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021), the court explained that an ALJ may rely on a consultant's narrative assessment if the limitations that the narrative describes are consistent with the consultant's ratings—appearing in "the checklist portion of the [same] form"—of the various functions contained in the paragraph B criteria.  The court also explained that a moderate limitation is defined by regulation for claims like Henri A.'s, filed on or after January 17, 2017, to mean that functioning in that area on a sustained basis is fair.  *Id.* (citing 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(c)).  And the court further explained that "'fair' in ordinary usage does not mean 'bad' or 'inadequate.'"  *Pavlicek*, 994 F.3d at 783.  The consultants' assessments that Henri A. had moderate limitations interacting with others, including accepting instructions and criticism from supervisors, does not mean that he was unable to sustain those interactions in a work environment.[5]  Neither the consultants' narratives that Henri A. was limited to work in a low social context or the ALJ's RFC finding that Henri A. was limited to occasional interaction with others is inconsistent with the consultants' assessments that Henri A. had a fair ability to interact with others on a sustained basis.

Henri A.'s argument is unclear as to the qualitative limitation that he believes was assessed by a medical source.  He contends that his hearing counsel's cross-examination of the VE "specifically addressed an additional limitation which would speak to the qualitative issues

---

1996 WL 374184, at *4.  The reviewing consultants provided their assessments on a standard form that addressed the paragraph B criteria specifically in one section (the "checklist") and Henri A.'s RFC limitations in "narrative form" at the end, *i.e.*, the consultants' verbatim descriptions quoted earlier in this Entry.  (Filing No. 8-4 at 38-40.)

[5] The consultants' checklists also included their assessments that Henri A. was "[n]ot significantly limited" with his ability to maintain socially appropriate behavior.  (Filing No. 8-4 at 15; Filing No. 8-4 at 39.)

mentioned above." (Filing No. 13 at 14; *see* Filing No. 13 at 14 n.1.)  His counsel asked the VE, because the consultative examiner "had mentioned that [Henri A.] has a history of narcissistic traits and personality – anti-social personality, conflicts, if he occasionally fails to accept constructive criticism, instruction and/or redirection from supervisors, and by occasionally[,] I mean up to 1/3 of the time, is that going to be tolerated in competitive work?" (Filing No. 8-3 at 25.)  The VE testified that based on her experience that would not be tolerated by employers in the competitive economy.  *Id*.  The limitation described by Henri A.'s counsel appears to be quantitative rather than qualitative.  The quantitative limitation just modifies a more specific aspect of interaction with supervisors rather than modifying the broader categories of interaction that were quantitatively limited by the ALJ.  Regardless, no medical source assessed the specific limitation that Henri A.'s hearing counsel put to the VE.  The specific limitation was hearing counsel's own interpretation of the report of the psychological consultative examiner, Noelle Rohen, Ph.D.[6]

In *Reynolds v. Kijakazi*, 25 F.4th 470, 473-74 (7th Cir. 2022), the court rejected substantially similar arguments asking the ALJ or reviewing courts to "intuit" or "infer" a qualitative interaction limitation from medical opinions that did not explicitly include such a limitation.  The court also explained that observations in the record that the claimant was sometimes aggressive, had difficulty managing emotions, and could become angry or annoyed,

---

[6] After a consultative examination on July 15, 2019, Dr. Rohen explained that Henri A. presented "with antisocial and narcissistic attitudes, with underlying pervasive irritability." (Filing No. 8-10 at 39.)  Dr. Rohen "anticipate[d] that [Henri A.] will have trouble getting along with others, [and] will do best in positions in which he can work by himself." *Id*.  Beginning at the initial phase, the reviewing consultant considered Dr. Rohen's report when they made their assessments. (Filing No. 8-4 at 4-12.)  Regardless, Henri A.'s briefs have not identified Dr. Rohen's statements—that he anticipated Henri A. to have trouble getting along with others or he would do best work working by himself—as the basis of any argument.  The Court finds any argument based specifically on those statements to be waived because of a lack of development.

did not "amount to medical evidence that [the claimant's] RFC should have included a qualitative interaction limitation."  *Id*. at 474.  "Put another way, evidence that [the claimant] sometimes struggle[d] to interact appropriately with others does not mean an occasional interaction limitation was insufficient in this case."  *Id*.

> Here, the ALJ explained:

> [Henri A.] stated that he had some problems with anger because he had pain and people were not giving attention to his complaints.  He said that he had been frustrated, but he denied that he threatened to kill anyone.[7]  He said that he had no conflicts with coworkers, but he admitted that he might stand up for himself to supervisors if he was asked to perform extra work or to perform tasks, such as lifting something heavy or bending.  He said that he had not received any written reprimands at work.

([Filing No. 8-2 at 21](#) (footnote added).)  Henri A. testified that he "had never had conflict with coworkers."  ([Filing No. 8-3 at 17](#).)  When the ALJ asked if Henri A. had even been formally written-up or had an "informal discussion kind of reprimand," he explained that a temporary agency had reported that an employer was unhappy with him, but he had not seen any formal document, and the employers always told him that he did an "excellent job."  ([Filing No. 8-3 at 17](#).)

> The ALJ addressed evidence that Henri A. "had conflicts with his medical providers," ([Filing No. 8-2 at 18](#) (citations omitted)), that he reported that "he was angry all the time," and an examination showed that "he was anxious, easily agitated, rude, and he had a belligerent affect," ([Filing No. 8-2 at 24](#) (citations omitted)).  But the ALJ also cited evidence that other examinations showed that Henri A. "was cooperative, he had an appropriate mood and affect and had normal

---

[7] The medical records indicate that Henri A. was discharged from a treating provider's care because, as he was leaving his appointment, a medical assistant heard him say that he was going to kill a specific physician for putting something that was untrue in his treatment notes concerning him wanting opioids and admitting to cocaine use.  ([Filing No. 8-18 at 17](#).)

judgment," (Filing No. 8-2 at 26 (citation omitted)), and he "was pleasant, joking and easily conversational," (Filing No. 8-2 at 30 (citation omitted)).

Accordingly, based on the holdings of *Pavlicek* and *Reynolds*, Henri A. has not demonstrated that the ALJ's RFC finding concerning his mental functioning was insufficient to account for his limitations that were demonstrated by the record. The ALJ's relevant RFC finding is supported by substantial evidence, including the assessments of the psychological consultants.

**B.    Subjective Symptom Evaluation**

When evaluating a claimant's subjective statements about the intensity and persistence of symptoms, the ALJ often must make a credibility determination concerning the limiting effects of those symptoms. *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). Reviewing courts "may disturb the ALJ's credibility finding only if it is 'patently wrong.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015)). If a fully favorable determination cannot be made based solely on the objective medical evidence, SSR 16-3p directs the ALJ to consider "all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms . . . ." SSR 16-3p (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *6-8. This includes the regulatory factors relevant to a claimant's symptoms, like daily activities, the location, duration, frequency, and intensity of pain or other symptoms, factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; and treatment, other than medication, an individual receives or has received for relief of pain or other symptoms. *Id*. at *7-8; 20 C.F.R. § 404.1529(c)(3). The ALJ need only "discuss the factors pertinent to the evidence of record." SSR 16-3p, 2017 WL 5180304, at *8. The ALJ should also consider any inconsistencies within the evidence, including conflicting statements made by the claimant and

others like treating sources. 20 C.F.R. § 404.1529(c)(4). The ALJ may also consider inconsistencies between the severity of symptoms that a claimant described to the SSA compared with when he was seeking treatment. *See e.g.*, *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005). And the ALJ is required to credit the limitations established through subjective statements only to the extent that he finds them credible. *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009).

Henri A. contends that the ALJ relied on boilerplate language and did not provide any clearly articulated reasons to discredit all of Henri A.'s subjective statements. (Filing No. 13 at 14-15.) Henri A. asserts that the ALJ provided "sound analysis" of only two symptoms—depression and anxiety—that were properly identified, weighed, and explained to be inconsistent with the record. (Filing No. 13 at 16.) Henri A. argues that the ALJ's failure to otherwise explain his reasoning "is problematic with respect to [Henri A.'s] claims regarding [his] ability to open a Gatorade bottle or cut tomatoes." *Id*. Henri A. further argues that the VE's testimony—that a more restrictive limitation with fingering and handling would be work preclusive—demonstrates that the ALJ's improper subjective symptom evaluation was prejudicial to the case. (Filing No. 13 at 16-17.)

The ALJ summarized Henri A.'s testimony in detail. (Filing No. 8-2 at 20-21.) In relevant part, the ALJ explained:

> [Henri A.] stated that he had difficulty with using his right hand. He said that he broke his hand in 2009 and he had an infection. He said that he ambidextrous [sic], but he was primarily right handed. He said that his nerves in his hands were bent and twisted in an awkward position. He said that he had carpal tunnel syndrome and he was unable to open a bottle or [sic] milk or a bottle of Gatorade. He said that he had to use his whole arm and press it against his chest to make a grip. He said that he had no feeling from his ring finger to his pinky. He said that cutting tomatoes with a knife would aggravate his hand.

(Filing No. 8-2 at 21.)  Henri A. testified concerning his right upper extremity that his wrist was deformed in "an awkward position," he could not bend it, and it was "to the point that [he could not] even hold anything in [his] hand."  (Filing No. 8-3 at 18.)  He said that had no "grip at all" in his right hand and he could not open a bottle without using his whole arm pressed against his chest. *Id.*  He further testified that he could use a knife to cut "through one-and-a-half tomatoes before it [would] fall[] out [of his] hand."  (Filing No. 8-3 at 19.)

After the ALJ summarized Henri A.'s testimony, the ALJ provided familiar boilerplate language:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Filing No. 8-2 at 21.)  In *Martinez v. Astrue*, 630 F.3d 693, 696-97 (7th Cir. 2011), the court noted the ALJ's use of a similar "boilerplate recital" concerning the claimant's credibility, but the court remanded based on the ALJ's summary of "so little of the evidence," failure to address later conflicting evidence, and failure to "so much as mention" the claimant's difficulty using her hands. The court found the ALJ's lack of attention to the relevant record particularly egregious because the ALJ concluded that the claimant could work as a hand assembler.  *Id.* at 797.  However, the Seventh Circuit has also held that "the use of boilerplate is not a ground to remand if the ALJ justified his credibility assessment based on the evidence." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (citing *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014); *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013)).

Concerning Henri A.'s credibility generally, the ALJ explained:

> The record tends to show that the claimant had participated in physical therapy in
> the past, but most of his treatment was provided the [sic] conservative measures,
> particularly with oral medications.  It appeared that the claimant was offered or he
> was referred for a surgical consultation, but it did not appear that he followed up
> with that.  He was offered injection therapies, but this was declined by the claimant.
> For whatever reason, the claimant accepted oral medications as a means of
> addressing pain almost exclusively.

([Filing No. 8-2 at 30](#).)  Henri A. does not acknowledge or address the ALJ's rationale that his pursuit of treatment options was not in proportion with his pain complaints.  The ALJ also detailed Henri A.'s testimony regarding marijuana use that was not completely forthcoming until he was confronted with the record.[8]  ([Filing No. 8-2 at 20](#).)

Regarding Henri A.'s allegations about the use of his right upper extremity, the ALJ did not provide an explicit reason that he discredited that specific testimony.  But in *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012), the court explained that the ALJ "could have referenced the fact that the evidence did not support [the claimant's] assertion that he needed to lie down several times per day, though we note that an ALJ's credibility findings need not specify which statements were not credible."  Despite the ALJ's use of a considerable amount of boilerplate language, the court held that the ALJ had adequately evaluated the claimant's credibility, the evaluation need not be perfect, and the claimant had not demonstrated that the evaluation was patently wrong.  *Id.*

Here, the ALJ addressed relevant record evidence that Henri A. reported numbness and tingling in his right hand related to a right wrist distal radius fracture in 2009 with associated carpal

---

[8] The ALJ asked, "In March of this year, you told the doctors you were smoking 10 cigarettes a day, plus using marijuana on a daily basis.  Okay.  Are you still using marijuana?"  ([Filing No. 8-3 at 13](#).)  Henri A. responded, "No, sir, I stopped," and the ALJ asked, "When did you last use any marijuana?"  *Id.*  He replied that "the last time [he] used marijuana was around May."  *Id.*  The ALJ then asked, "Now, they said in July, 12F, page 18, that you were still eating marijuana, you were taking it in edible form in July, does that refresh your recollection?"  ([Filing No. 8-3 at 13-14](#).)  Henri A. testified, "Yes, sir, I stopped smoking it, because Dr. Laurie told me if I'm doing that, I need to get medical because the smoke is not good for my lung."  ([Filing No. 8-3 at 14](#).)  On July 21, 2020, Henri A. reported that he "use[d] marijuana that he [ate] occasionally."  ([Filing No. 8-16 at 19](#).)

tunnel syndrome, he was diagnosed with a residual deformity, and on different examinations he had a mildly positive Tinel's sign or a negative Tinel's sign, some slight limitation of supination and pronation of the right forearm, but full strength and trace positive symmetric reflexes in his upper extremities. (Filing No. 8-2 at 21-23.)  The ALJ also detailed the relevant findings of the physical consultative examination in 2019, as well as the examiner's assessments. (Filing No. 8-2 at 33-34.)

Henri A. has not attempted to show how the record supported his testimony—concerning his alleged inability to use his right hand to grip or hold items for any length of time—by identifying instances of him making similar allegations to treating providers.  On January 15, 2018, during an orthopedic evaluation following a remote motor vehicle accident, Henri A.'s examination showed that his sensory and motor functions were "grossly intact," he had normal reflexes, and full strength in both upper extremities, he had mildly positive Tinel's and Phalen's signs in his right hand, but no pain with passive range of motion or sign of compartment syndrome, and he was diagnosed with mild carpal tunnel syndrome in his right hand.  (Filing No. 8-10 at 23.)  On June 28, 2018, during an evaluation by an orthopedic surgeon following another more recent motor vehicle accident, he reported "right hand tingling and numbness related to a right wrist fracture in 2009 with carpal tunnel syndrome. . . ."  (Filing No. 8-10 at 5.)  Henri A. had "full strength testing of the upper extremities at 5/5 for deltoids, biceps, triceps, wrist extensors, grip and interossei." (Filing No. 8-10 at 6-7.)  He had "[n]egative Tinel's over the median nerves at the wrists and ulnar nerves at the elbows.  He ha[d] a dorsal deviation deformity of the right distal radius involving the distal fourth of the radius.  He ha[d] some slight limitations of the supination and pronation of the right forearm as compared to the left," and reflexes in his upper extremities were "trace," but "symmetric" throughout.  (Filing No. 8-10 at 7.)  The orthopedic surgeon assessed "2009, right

wrist distal radius fracture with residual deformity and carpal tunnel symptoms, mild unrelated to the motor vehicle crash of . . . June 2018." *Id.*  The examiner also assessed that "[w]ork restrictions [were] no lifting over 20 pounds."  ([Filing No. 8-10 at 8](.))

On May 20, 2019, Henri A. filled out a functional report for the SSA and reported that due to neck and back injuries sustained in accidents, he could not meet the requirements for his line of work, including to lift up to 100 pounds because he could not lift over 20 pounds.  ([Filing No. 8-8 at 48](.))  While he checked boxes indicating that he had issues with every listed functional aspect of work provided by the form, including using his hands, he did not describe any specific problems using either hand.  ([Filing No. 8-8 at 49-54](.))

On June 15, 2019, Henri A. went to the emergency room with a "chief complaint" of "neck and back pain," but he also mentioned "ongoing chronic numbness and tingling in the right hand[,] elbow[, and] wrist and also in the right knee."  ([Filing No. 8-12 at 7](.))  On August 22, 2019, he again went to the emergency room for "neck and low back pain," but he reported "a tingling sensation in his arms and both legs primarily in the right leg."  ([Filing No. 8-13 at 9](.))

On August 6, 2019, Henri A. attended a consultative examination performed by Richard Palmer, M.D.  ([Filing No. 8-10 at 42](.))  Henri A. reported that he had developed carpal tunnel syndrome with symptoms affecting his right hand that traveled proximally into the forearm and upper arm, he had pain, tingling, and numbness affecting all digits of the right hand, and he had weakness affecting the ring and middle finger of the right hand.  *Id.*  The examination revealed "[n]o guarded movements of upper extremities."  ([Filing No. 8-10 at 43](.))  An examination of his right wrist showed mild-to-moderate bony enlargement of the ulnar styloid, mild-to-moderate bony enlargement of the carpal bones on the radial side, no swelling or color changes, limited supination, stiffness in all measured movements, dorsiflexion range of motion was 50/60, palmar-

flexion was 20/60, radial deviation was 15/20 with audible crepitations heard, ulnar deviation was normal, and his hands appeared normal.  (Filing No. 8-10 at 44.)  A neurological examination showed that strength against resistance testing was 5/5 in the left hand, 5/5 in the right pincer, -5/5 with right grip, 4+/5 abduction in the ring and little finger of the right hand, and -5/5 adduction in the ring and little finger of the right hand.  (Filing No. 8-10 at 45.)  Sensation to monofilament touch was diminished in all digits of the right hand and ulnar side of the right forearm, normally detected in the left hand and left forearm, diminished on the lateral and medial side of the right lower leg, and normal in the left lower leg.  *Id.*  Deep tendon reflexes were mildly hyperreactive throughout, if not normal, except they were absent in the right knee and right ankle.  *Id.*  Rapid alternating movements with his hands were normal.  *Id.*  Compression tests for carpal tunnel syndrome were negative bilaterally.  *Id.*  Dexterity testing—described as "using the tips of the thumb and index finger to pick up a 5 mm rolled paper ball off a flat surface"—revealed minor slowness/awkwardness completing the task with his right hand.  *Id.* (emphasis removed).

Dr. Palmer provided a medical source statement that Henri A. could occasionally[9] lift and carry 10 pounds and frequently[10] lift and carry less than 10 pounds.  (Filing No. 8-10 at 47.)  Dr. Palmer assessed that Henri A. could frequently reach, handle, finger, and feel with the right upper extremity.  (Filing No. 8-10 at 49.)

The reviewing consultants also both assessed that Henri A. was limited to lifting and carrying 10 pounds occasionally, lifting and carrying less than 10 pounds frequently, and frequent gross and fine manipulation, *i.e.*, handling and fingering, with the right hand.  (Filing No. 8-4 at 12-13; Filing No. 8-4 at 35-36.)  The consultants reviewed all the evidence discussed above and

---

[9] Occasionally is defined on the form as "up to 1/3 (generally no more than 2 hrs.) of an 8 hr. day."  (Filing No. 8-10 at 47.)

[10] Frequently is defined on the form as "1/3 to 2/3 of an 8 hour day."  (Filing No. 8-10 at 47.)

they explicitly referenced Henri A.'s history of a right wrist fracture and mild deformity as supporting their assessments.  (Filing No. 8-4 at 12; Filing No. 8-4 at 35.)  The ALJ's RFC finding was consistent with those assessments.  The VE testified that if—in addition to all the limitations that would ultimately comprise the ALJ's RFC finding—an individual was further limited to occasional handling or fingering with the right upper extremity, the representative occupations that the ALJ ultimately relied on as the basis of the step five denial would be precluded.  (Filing No. 8-3 at 25.)  But no medical source assessed that specific limitation.  Regarding the ALJ's RFC finding, the Seventh Circuit has explained that "[w]hen no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error." *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) (citing *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)); *Gedatus v. Saul*, 994 F.3d 893, 904 (7th Cir. 2021) ("A fundamental problem is [he] offered no opinion from any doctor to set . . . any other limits, greater than those the ALJ set.").  Here, no medical source assessed any specific relevant functional limitations that were more restrictive that the ALJ's RFC finding.  Accordingly, Henri A. cannot establish error with the ALJ's relevant RFC finding.

Similarly, the Court finds no basis to conclude that remand is appropriate or necessary to have the ALJ specifically explain why he rejected Henri A.'s subjective allegations about the limited use of his right hand.  Henri A. had a mild relevant deformity based on a remote injury and there is no indication that he reported to his treating providers that he was as significantly limited as he described in his testimony, *i.e.*, that his functional limitations and markedly progressed.  Considering the record, the ALJ's general rationale for discrediting Henry A.'s statements—that he did not seek treatment commensurate with his complaints—is sufficient.  Accordingly, Henri A. has not demonstrated that the ALJ's subjective symptom evaluation was patently wrong.

18

C.    **Significant Number of Jobs**

At step five, the burden shifts to the Commissioner to prove that the claimant can perform

any other work that exists in significant numbers in the national economy.  *Prill v. Kijakazi*, 23

F.4th 738, 747 (7th Cir. 2022).  The Social Security Act explains:

> An individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy, regardless of whether such work exists in the immediate area in
> which he lives, or whether a specific job vacancy exists for him, or whether he
> would be hired if he applied for work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the national economy" means
> work which exists in significant numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).  The SSA's relevant regulation tracks the statutory authority adding

some elaboration:

> How we determine the existence of work.  Work exists in the national economy
> when there is a significant number of jobs (in one or more occupations) having
> requirements which you are able to meet with your physical or mental abilities and
> vocational qualifications.  Isolated jobs that exist only in very limited numbers in
> relatively few locations outside of the region where you live are not considered
> "work which exists in the national economy."  We will not deny you disability
> benefits on the basis of the existence of these kinds of jobs.  If work that you can
> do does not exist in the national economy, we will determine that you are disabled.
> However, if work that you can do does exist in the national economy, we will
> determine that you are not disabled.

20 C.F.R. § 404.1566(b).

At step five, the ALJ found, based on the VE's testimony and Henri A.'s age, education,

work experience, and RFC, that there were jobs existing in significant numbers in the national

economy that he could perform in representative occupations as an addresser, with 3,900 jobs in

the nation, and document preparer, with 19,000 jobs in the nation.  (Filing No. 8-2 at 35-36.)  The

ALJ's step five finding is supported by the testimony of the VE, who identified those occupational

titles and national job numbers after considering an individual with the limitations that would ultimately comprise the ALJ's RFC finding along with Henri A.'s vocational profile.  (Filing No. 8-3 at 21-23.)

Henri A. contends that the ALJ did not create a logical bridge to his conclusion that the jobs existed in the region where Henri A. lived or several regions of the country.  (Filing No. 13 at 18.)  In support of his contention, he argues that the ALJ did not identify the region where Henri A. lived.  *Id*.  He also argues that the ALJ did not solicit testimony from the VE about the geographical concentration of the jobs.  *Id*.

During the hearing, the ALJ recognized that Henri A. was homeless, but he asked him if there was a good mailing address where he could receive correspondence.  (Filing No. 8-3 at 8.) Henry A. testified that he could get mail at a friend's address in Tucson, Arizona.  *Id*.  However, the VE did not appear to be on the line during this portion of the telephonic hearing.  (*See* Filing No. 8-3 at 7 (the ALJ only identified Henri A. and his hearing counsel as on the telephone); Filing No. 8-3 at 19 (the hearing reporter needed to get the VE on the line for the ALJ prior to the VE's testimony at the end of the hearing).)  And the hearing notice sent to the VE identified the ALJ as located in the Tucson hearing office but did not provide the VE with any address for Henri A. (Filing No. 8-6 at 23-24.)  The certified transcript does not indicate exactly what vocational materials were available to the VE, and the hearing transcript does not indicate what she reviewed or show that she was informed of Henri A.'s relative location.  Accordingly, considering that the burden is on the Commissioner, the Court will not assume that the VE was apprised of the region where Henri A. was located.

However, persuasive authority from this Court has rejected the "argument that when jobs numbers are expressed on a national basis only, they never provide substantial evidence for the

conclusion that jobs exist 'in the national economy' in the 'region' where the claimant lives or in 'several regions' in the country, no matter the jobs' apparent ubiquity . . . ." *John R. v. Saul*, 2020 WL 6435031, at *5 (S.D. Ind. Oct. 14, 2020), *adopting report and recommendation sub nom.*, *Ritchie v. Saul*, 2020 WL 6411850 (S.D. Ind. Nov. 2, 2020).  The Seventh Circuit has commented, albeit in passing, that the utility of the SSA citing local and state job figures "is unclear, since if there is a significant number of jobs that the applicant for benefits can perform anywhere in the United States he is deemed not disabled . . . ." *Alaura v. Colvin*, 797 F.3d 503, 507 (7th Cir. 2015) (citation omitted).  In *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012), the Ninth Circuit explained that it had "never set out a bright-line rule for what constitutes a 'significant number' of jobs," but that 135 regional jobs and 1,680 national jobs fell short of the Commissioner's burden without deciding "the floor." *Id*. at 390.  The court considered the VE's testimony—during cross-examination by the claimant's representative—that she was not familiar with the area where the claimant lived, nor if the occupation in question could be found there.  *Id*.  But here, Henri A.'s counsel did not avail himself of the opportunity to cross-examine the VE about her knowledge concerning the distribution of addresser and document preparer jobs.  And the Social Security Act is explicit that jobs need not be located where the claimant lives if they are located in several regions of the county.  42 U.S.C. § 423(d)(2)(A).  The United States Supreme Court has explained that "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154.  When discussing an ALJ's reliance on a vocational expert's opinion, the court explained that "even without significant testing, a factfinder may conclude that testimony has sufficient indicia of reliability to support a conclusion . . . ." *Id*. at 1157.  The Court can take judicial notice of the fact that an addresser and document preparer are the type of clerical occupations that are likely well-dispersed in several regions throughout the

nation.  *See Dictionary of Occupational Titles*, DICOT 249.587-018 (G.P.O.), 1991 WL 672349 (document preparer is a clerical and sales occupation); DICOT 209.587-010 (G.P.O.), 1991 WL 671797 (same with addresser).  And even though it's not necessarily material, the ALJ was aware of Henri A.'s location.  In Tucson, the second largest city in Arizona and location of the University of Arizona, it is reasonable to assume the presence of clerical occupations without any evidence on the record supporting or refuting that assumption.  Accordingly, Henri A. has not demonstrated that the ALJ's step five finding was unsupported by substantial evidence because there was not testimony elicited about the geographical distribution of the jobs.

Henri A. also contends that the ALJ provided no analysis, discussion, or evidence to support his conclusion that 19,000 jobs was a significant number.  (Filing No. 13 at 18-19.)  He argues that based on a commercial website's job statistics,[11] 19,000 jobs represent only .015 percent of the 123.16 million jobs in the United States in 2020.  The ALJ stated that "[n]ineteen thousand jobs is a significant number in the national economy." (Filing No. 8-2 at 36.)  However, that statement was in the context of the ALJ's alternative finding that if Henri A. also needed to use a cane, the VE testified that only the document preparer occupation would remain as viable. *Id*.; (*see* Filing No. 8-3 at 24-25 (VE's testimony that addresser occupation would require an accommodation to be performed by an individual who needs to use a cane).)  The ALJ concluded that based on the objective record, Dr. Palmer's opinion was not persuasive as it pertained to Henri A. needing to use a cane.  (Filing No. 8-2 at 34.)  Henri A. has not presented any argument concerning the ALJ's conclusion that he did not need to use a cane, and any such argument is waived.  Accordingly, the combined number of jobs for the addresser and document preparer

---

[11] *See https://www.statista.com/statistics/192356/number-of-full-time-employees-in-the-usa-since-1990/* (last visited January 5, 2023).

occupations, 22,900 total jobs, is the appropriate basis of the ALJ's step five finding to be evaluated for significance.

In *Milhem v. Kijakazi*, 52 F.4th 688, 695 (7th Cir. 2022), the Seventh Circuit held that based on the Social Security Act and the SSA's regulations, the ALJ's step-five "determination does not depend upon the establishment of a standard for significance." The court also rejected similar arguments as presented here based on the percentage of the total number of national jobs and the same unpublished decision cited by Henri A. that the ALJ could not find that 89,000 national jobs was a significant number of jobs. *Id*. The court explained that "[i]n determining whether there is a 'significant' number of jobs in the national economy, the regulatory scheme gives the ALJ discretion to decide, using substantial evidence, when a number of jobs qualifies as significant." *Id*. at 696. The court concluded that the ALJ's reliance on the testimony of the VE, who considered the same vocational factors as the VE here, provided a sufficient factual and evidentiary basis to conclude that 89,000 jobs was significant according to the deferential, substantial evidence standard. *Id*. The court further explained that the "ruling [was] also in accord with the numbers of national jobs held to be significant by other circuits." *Id*. at 697 (citing *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (32,000 national jobs); *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) (25,000 national jobs); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (10,000 national jobs); *Weiler v. Apfel*, 179 F.3d 1107, 1110–11 (8th Cir. 1999) (32,000 national jobs)).

The Court also notes that in *Dorothy B. v. Berryhill*, 2019 WL 2325998, at *7 (N.D. Ill. May 31, 2019), another court considered national numbers and found 17,700 jobs to be significant. Based on the record developed by the ALJ, the deferential substantial evidence standard, the rationales of *Milhem*, the persuasive authorities of *Dorothy B.*, and the Eight Circuit in *Johnson*,

the Court finds that 22,900 national jobs is a significant number in this case. Accordingly, Henri

A. has not demonstrated that the ALJ's step five finding was not supported by substantial evidence.

<strong>V.</strong>     <u><strong>CONCLUSION</strong></u>

"The standard for disability claims under the Social Security Act is stringent." *Williams-*

*Overstreet v. Astrue*, 364 F. App'x 271, 274 (7th Cir. 2010). For the reasons stated above, the

Court finds no legal basis to reverse the ALJ's decision. The final decision of the Commissioner

is **AFFIRMED**. Henri A.'s appeal is **denied**.

**SO ORDERED.**

Date: 1/25/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Ann E. Young
FORBES RODMAN PC
elizabethkohli@forbesrodman.com

James T. Zender
FORBES RODMAN PC
jtzender@gmail.com

Jason Scott Rodman
FORBES RODMAN PC
jasonrodman@forbesrodman.com

Randal S. Forbes
FORBES LAW OFFICE
randy@needsocialsecurity.com

Jane Kuczek
SOCIAL SECURITY ADMINISTRATION
jane.kuczek@ssa.gov

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov